**UNITED STATES of America, Plaintiff,**

v.

**FIRST NATIONAL STATE BANCORPO-RATION, First National State Bank of Central Jersey and First National Bank of South Jersey, Defendants,**

and

**John G. Heimann, Comptroller of the Currency, Intervenor.**

Civ. A. No. 79–1785.

United States District Court, D. New Jersey.

Nov. 7, 1979.

Thomas L. Greaney, Antitrust Div., Dept. of Justice, Washington, D.C., and Susan P. Engelman, Asst. U.S. Atty., Deputy Chief, Civ. Div., Newark, N.J., for plaintiff.

Eugene J. Metzger, Michael E. Friedlander, Metzger, Shadyac & Schwarz, Washington, D.C., David T. Wilentz, Wilentz, Goldman & Spitzer, Woodbridge, N.J., and Harold E. Mortimer, Newark, N.J., for defendants.

Charles H. McEnerney, Jr., Thomas P. Vartanian, Washington, D.C., for intervenor.

## OPINION

GERRY, District Judge.

This antitrust action was brought by the United States to enjoin a proposed merger of two New Jersey banks on the ground that such a merger would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The defendants, First National State Bancorporation ("Bancorp"), First National State Bank of Central Jersey ("Central"), and First National Bank of South Jersey ("South"), and the intervenor, the Comptroller of the Currency, have moved to lift the statutory stay of the merger which was automatically imposed by the Bank Merger Act of 1966 (the "Bank Merger Act"), 12 U.S.C. § 1828(c)(7)(A), upon the filing of this suit. At the close of oral argument heard on September 21, 1979, the court rendered its decision from the bench denying the motions to lift the stay. This opinion is intended to supplement the court's ruling.

### BACKGROUND OF THE ACTION

The acquiring bank, defendant Central, operates in Trenton, New Jersey and the surrounding area and is wholly owned by defendant Bancorp, a registered bank holding company. Bancorp controls six New Jersey banks, including Central, and ranks as the state's largest banking organization, holding approximately 8% of the total commercial bank deposits in New Jersey. Bancorp's subsidiaries are located primarily in central and northern New Jersey.

The bank to be acquired, defendant South, is the largest commercial bank in Atlantic County with over 46% of the commercial bank deposits in that county. Only one of Bancorp's subsidiaries, First National State Bank of West Jersey ("West") operates in Atlantic County. It holds approximately 3% of that county's bank deposits.

As part of the merger agreement, South proposes to sell two Atlantic City offices and two Burlington County offices[1] to

---

1. According to a copy of a report submitted by the U.S. Department of Justice on April 19, 1978 to the Comptroller of the Currency, attached as an exhibit to plaintiff's brief, West's head office is in Burlington County, and the two South offices in that county are within ten

banks not presently located in the Atlantic City and Burlington County markets,[2] and Bancorp proposes to sell West's three Atlantic County offices, also to new market entrants. The purpose of these sales would be to maintain the number of competitors in this region of New Jersey after the merger and minimize the effect of the loss of competition between South and Bancorp.

Pursuant to the Bank Merger Act, 12 U.S.C. § 1828(c), approval of the proposed merger between South and Central was sought of the Comptroller of the Currency. The Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation and the United States Attorney General's office each submitted reports to the Comptroller of the Currency concluding that the proposed merger would have significant adverse effects on competition. Nevertheless, on May 8, 1979, the Comptroller approved the merger on condition that the four South offices and three West offices be sold as described above. This suit followed, automatically staying the merger under the Bank Merger Act.

The complaint filed by the plaintiff seeks to enjoin the merger on the ground that it will (1) eliminate substantial direct and potential competition between South and Bancorp in the Atlantic County and other smaller commercial banking communities; (2) eliminate Bancorp as a potential competitive factor in these communities; and (3) significantly increase concentration of these already concentrated markets, all in violation of Section 7 of the Clayton Act.

On September 7, 1979, the Comptroller of the Currency was granted leave by this court, pursuant to 12 U.S.C. § 1828(c)(7)(D), to intervene in the action.

## STATUTORY FRAMEWORK OF THE BANK MERGER ACT

The statutory stay imposed by the commencement of any antitrust action arising out of a bank merger forms an integral part of a legislatively enacted procedure whose purpose is reflected in its title: "An act to establish a procedure for the review of proposed bank mergers so as to eliminate the necessity for the dissolution of merged banks." Act of February 21, 1966, P.L. No. 89–356, 80 Stat. 7 (1966).

The legislative history which the parties have elaborated on at length confirms that the Bank Merger Act was designed to provide a means of reviewing the effects of bank mergers on competition prior to their consummation. Such prior review is intended to minimize those disruptions in the banking community which would occur if completed mergers were held to be unlawful under the antitrust laws, thereby necessitating a judicial decree of divestiture.[3]

To accomplish this purpose, the statute sets up a two-step process of administrative

---

miles of this office and within five miles of another West office. A copy of the Decision of the Comptroller of the Currency on the Application to Merge, dated May 8, 1979, attached as an exhibit to defendants' brief, states that these two South offices are also within six miles of several Central offices in Mercer County.

2. These descriptions of the affected market are merely for convenience and are not intended as definitions of the relevant market for purposes of determining the legality of the merger under Section 7 of the Clayton Act. As set forth more fully, *infra*, we are not required to rule upon the merits of the asserted antitrust violations at this time.

3. Various "unscrambling" problems which would arise from a post-merger divestiture order have been identified by courts interpreting

the Bank Merger Act. Some of the problems identified include:

 (1) identifying and unscrambling accounts, depositors, creditors and personnel of the divested bank;
 (2) finding appropriate investors or buyers and an appropriate price for the divested banks;
 (3) generally restoring the economic *status quo ante*;
 (4) sustaining the management of the unscrambled banks; and
 (5) assuring public confidence in the stability of the financial institutions.

*U. S. v. First City National Bank of Houston*, 386 U.S. 361, 370 n. 2, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); *U.S. v. United Banks of Colorado, Inc.*, [1971] Trade Reg.Rep. (CCH) ¶ 73,421 at 89,714 n. 1 (D.Colo.1970); *First Midland Bank & Trust Co. v. Chemical Financial Corp.*, 441 F.Supp. 414, 418–19 (W.D.Mich.1977).

and federal judicial review. First, any bank merger must be approved by a particular bank regulatory agency (in this case, the Comptroller of the Currency), which relies for assistance on reports submitted by the Attorney General and two other federal banking agencies (in this case, the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation) concerning the impact of the proposed combination on competition. 12 U.S.C. § 1828(c)(2)–(4).

No merger may be approved where the effect "may be substantially to lessen competition," unless the responsible agency "finds that the anti-competitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." *Id.* § 1828(c)(5)(B). In this case, the proposed merger was approved by the Comptroller of the Currency, although the Attorney General and the two other banking agencies noted that it would have a significant negative impact on competition.

The second step provides that if the merger is approved, its consummation is stayed for 30 days, during which time the Attorney General may file an antitrust suit to enjoin the merger. A trial *de novo* on the antitrust issues presented by the proposed merger is then held. The stay which is the subject of this motion is triggered upon the filing of such a suit. *Id.* § 1828(c)(7)(A).

This two-step procedure is mandated in all but emergency circumstances where the responsible agency "has found that it must act immediately to prevent the probable failure of one of the banks involved." *Id.* § 1828(c)(6).[4]

---

4. In the event of an emergency—an undefined term—the agency approval procedure is expedited. Reports must be furnished to the responsible agency within ten days. 12 U.S.C. § 1828(c)(4). The merger may be consummated ten days after the agency's approval, unless an antitrust suit is filed during that period. *Id.* § 1828(c)(6), (7). In an extreme emergency where the responsible agency finds "it must act immediately to prevent the probable failure of

*STANDARD FOR LIFTING THE STAY*

### 1. *Frivolity of the Complaint*

The Bank Merger Act provides that the commencement of any action brought under the antitrust laws arising out of a merger between two federally insured banks "shall stay the effectiveness of the [reviewing] agency's approval unless the court shall otherwise specifically order." *Id.* § 1828 (c)(7)(A). The statute is silent as to the grounds upon which a court should decide whether to lift the stay.

While conceding that the burden of proving that a stay should be lifted is on the defendant, defendants and the intervenor contend that the standards to be applied by a court in deciding whether that burden has been met are no different than in a motion for a preliminary injunction in non-bank merger cases where the statutory stay does not apply. Thus, defendants argue, the court should look to irreparable injury absent the injunction, likelihood of success on the merits, harm to other parties, and the public interest. *See Oburn v. Shapp*, 521 F.2d 142 (3d Cir. 1975). We disagree.

The standard for lifting the stay was established by the Supreme Court in *U. S. v. First City National Bank of Houston*, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), the only Supreme Court decision to discuss the issue. In that case, the Court reviewed two separate district court decisions lifting the stay following dismissals of the government's cases. The Court remanded these cases and directed that the stays remain in effect until the completion of the proceedings in the district court and the decision of any appeals that were taken. Ruling that a stay should not be lifted unless the plaintiff's complaint is "frivolous," the Court said:

one of the banks involved," reports from the other agencies may be dispensed with and the merger consummated immediately upon agency approval. *Id.* § 1828(c)(6). Because the statute requires that any antitrust suit be commenced prior to the earliest time at which an approved merger transaction might be consummated, there would appear to be no provision for filing a suit in the case of such an extreme emergency.

A stay of course is not mandatory under any and all circumstances. But *absent a frivolous complaint* by the United States, which we presume will be infrequent, *a stay is essential until the judicial remedies have been exhausted.* (Emphasis added.) The caption of the 1966 Act states that it is designed "[t]o establish a procedure for the review of proposed bank mergers so as to eliminate the necessity for the dissolution of merged banks." Moreover, bank mergers may not, absent emergency conditions, be consummated until 30 days after approval by the Comptroller in order to enable the Attorney General to commence an antitrust action, 12 U.S.C. § 1828(c)(6), which, apart from emergency situations, must be started within 30 days of the agency's approval, 12 U.S.C. § 1828(c)(7)(A). The legislative history is replete with references to the difficulty of unscrambling two or more banks *after* their merger. The normal procedure therefore should be maintenance of the *status quo* until the antitrust litigation has run its course, lest consummation take place and the unscrambling process that Congress abhorred *in the case of banks* be necessary.

386 U.S. at 370–71, 87 S.Ct. at 1094 (Footnotes omitted.)

■ Thus, the test as enunciated by the Supreme Court is simply: is the complaint frivolous? If not, the stay is to remain effective. Although the court did not elaborate on the meaning of "frivolous", this court agrees with the parties that this means absence of merit in both law and fact.[5]

This is quite a different standard from the one defendants would have this court apply. Decisions subsequent to the *Houston* case have made clear that in a bank merger case, the "issues confronting the court [under 12 U.S.C. § 1828(c)(7)(A)] are not those raised by a motion for a preliminary injunction, namely, irreparable harm, balancing of injuries, probability of success on the merits, and the public interest. . . [The] issues raised by defendants' motion to lift the automatic stay are much narrower." *First Midland Bank & Trust Co. v. Chemical Financial Corp.*, 441 F.Supp. 414, 417 (W.D. Mich.1977). *Accord, U. S. v. Citizens and Southern National Bank*, 339 F.Supp. 1143 (N.D.Ga.1972); *U. S. v. United Banks of Colorado, Inc.*, [1971] Trade Reg.Rep. (CCH) ¶ 73,421 (D.Colo.1970).[6]

Thus, in *U. S. v. United Banks of Colorado, Inc.*, [1971] Trade Reg.Rep. (CCH) ¶ 73,421 (D.Colo.1970), the district court refused to consider the defendant banks' arguments of irreparable harm and declined to lift the statutory stay because they had failed to carry their burden of proving the complaint was frivolous. The acquiring bank had argued that it would suffer irreparable harm as a result of the stay because the merger agreement was about to expire, that the government was unlikely to prevail on the merits because it was presenting novel, experimental and untried extensions of antitrust theory, and that it was willing to maintain the acquired bank as a separate entity capable of ready divestment in the event the plaintiff ultimately prevailed on the merits. The court considered these factors to be irrelevant to the narrow issue at hand, emphasizing that:

**5.** Support for this definition is found in the case law. A virtually identical definition was adopted by the district court in *U.S. v. Citizens and Southern National Bank*, 339 F.Supp. 1143, 1145 (N.D.Ga.1972), when it declined to lift a stay on the merger of several banks:

> In light of the *Houston* case, it is clear to the Court that the stay must not be lifted unless the complaint of the United States is *frivolous*. While the term "frivolous" may may be subject to conflicting interpretation, the Court construes the term as requiring at least an exceptionally strong showing by defend-

> ants that the government's civil complaint is devoid of merit.

**6.** Defendants cite *U. S. v. First National Bank of Hawaii*, 257 F.Supp. 591 (D.Haw.1966) in which a stay was lifted on grounds of irreparable harm to the defendant banks. The continued validity of this case is questionable, since it was decided before the *Houston* case and without knowledge that the Supreme Court would view the legal standard to be far more rigorous than that applied in a motion for preliminary injunction.

The test is whether the government's complaint is frivolous. While [the defendant] has shown that there may be some equity in its claim, it has failed to establish that the government's complaint is frivolous.

Id. at 89,714.

◼ The court finds unpersuasive defendants' attempts to draw from the legislative history of the Bank Merger Act support for their position that the standards for a preliminary injunction should apply to a motion to lift the stay. If anything, the legislative history suggests that Congress enacted the provision automatically staying proposed bank mergers precisely to avoid the problems which all too frequently arose in the past when the plaintiff's sole interim remedy, the preliminary injunction, proved useless to stop a merger during the pendency of what was later determined to be a meritorious challenge to the legality of the merger. It would seem that the automatic stay would lose much of its meaning if, to prevent its being lifted, the plaintiff would have to meet the very standard of proof which existed prior to the Bank Merger Act. For it was this standard which could not easily be met by the plaintiff that resulted in the disruptions of the banking industry that Congress intended to eliminate by the Bank Merger Act.[7]

◼ The court has considered the parties' submissions carefully and finds that under the clearly enunciated "frivolity" standard defendants and the intervenor have failed to meet their burden of establishing that the stay should be lifted.[8]

The complaint filed by the plaintiff in this case alleges that, notwithstanding the divestiture of the seven offices, which the intervenor has required as a condition of the merger, the effect of the proposed merger may be substantially to lessen actual and potential competition in the following ways:

1. Existing competition and the potential for increased competition between South and Bancorp in the concentrated Atlantic County and other smaller commercial banking communities will be eliminated.

2. Potential competition between South and Bancorp in these communities will be eliminated.

3. Bancorp will be eliminated generally as a potential competitive factor in these banking communities.

4. Concentration will increase by this merger, and subsequent mergers between other banks in these communities will be fostered thereby.

Defendants and the intervenor argue that plaintiff's first allegation concerning the lessening of actual competition is frivolous because the proposed plan to sell the three West offices and four South offices will effectively eliminate any adverse effects on direct competition in the banking communities as plaintiff defines them and, in fact, will increase the number of competitors in the Atlantic County market.

The court acknowledges that this plan would seem to eradicate the most obvious

---

7. Defendants suggest, without pointing to any authority, that traditional preliminary injunction standards should apply when the merging banks are willing to agree to a "hold-separate" mechanism which will reduce the unscrambling problems in any subsequent divestiture. The court disagrees, noting that this view flies in the face of the *Houston* opinion and its progeny. Even those courts which have considered proposed divestiture plans in ruling upon motions to lift the statutory stay have stressed that the preliminary injunction standard was inapplicable in that context. *First Midland Bank & Trust Co. v. Chemical Financial Corp.*, 441 F.Supp. 414 (W.D.Mich.1977). *See U. S. v. Michigan National Corp.*, [1974–2] Trade Reg. Rep. (CCH) ⁋ 75,408 (E.D.Mich.1974).

What defendants really argue is that the standard for lifting the stay should be whether the problems of unscrambling can be eliminated simply by means of a divestiture plan. As discussed in this opinion, it is the view of this court and others that a divestiture plan alone cannot provide a sufficient basis for lifting the stay.

8. Those submissions relevant to the instant motion that are properly before the court are the plaintiff's complaint and the answers of defendants and the intervenor. All parties have supplemented their filings with briefs. Plaintiff has also submitted a pretrial memorandum of factual contentions.

anti-competitive effects of the merger on direct competition, but it cannot at this time conclude that such a plan would fully cure all such effects. Plaintiff, in the memorandum of factual contentions submitted with its brief, notes that no sales or even contracts of sale have been finalized, and the court has not been advised to the contrary. Even if a sale is consummated, plaintiff argues that this will not automatically eradicate all negative effects of the merger on direct competition and that the court must still scrutinize the terms of the sale and the purchasers involved to determine whether a viable business is in fact being sold to capable competitors and whether the sales will result in the development of meaningful competition to replace the loss of the present competition between Bancorp and South.

Although plaintiff's burden of proof on this issue will be a heavy one, the court is satisfied that plaintiff's allegations regarding direct competition are not on their face devoid of factual or legal merit. A decision regarding the effective elimination of all direct anti-competitive effects engendered by the merger of the two banks must await a fuller hearing on the merits in which plaintiff is given an opportunity to present evidence to support its contentions. Likewise, the defendants' responses and proposed solutions to plaintiff's claims of antitrust violations can more properly be addressed to the court at such time as all relevant facts are a part of the record. The issue before the court at the present time is not whether plaintiff will be able to meet its burden of proof at trial but whether plaintiff's complaint is devoid of merit.

In addition to the direct competition issue, the allegations in the complaint raise other issues regarding the elimination of potential competition and the increase in market concentration, both of which defendants and the intervenor have failed to show are frivolous.

The theory of potential competition is largely concerned with the elimination of procompetitive effects in a particular market when a firm in the market merges with a firm which is either outside the market or in the market only by a "toehold." This doctrine was first clearly enunciated as a basis for a finding of a violation of the antitrust laws in the United States Supreme Court's opinions in *U. S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) and *U. S. v. Penn-Olin Chemical Co.*, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964) and was later developed in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) and *U. S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).[9]

In *U. S. v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Court applied the doctrine in the commercial banking context. In that case, a large Seattle Bank proposed to acquire a medium size Spokane bank. The banks were not in direct competition anywhere in the state, and the merger would allow the acquiring bank to operate for the first time as a direct participant in the Spokane market. In affirming the district court's judgment after trial against plaintiff, the United States, the Court held that bank mergers must pass muster under the potential competition theory.

The Court's opinion in the *Marine Bancorporation* case distinguished two branches of the theory: the concept of "perceived potential competition" and the concept of "actual potential competition." The Court focussed principally on the former concept which it described as involving an examination of "what is commonly known as the 'wings effect'—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo*. The elimination of such present procompetitive effects may render a merger unlawful under § 7 [of the Clayton Act]." *Id.* at 625, 94 S.Ct. at 2871 (citation and footnote omitted). The Court listed the following ele-

---

**9.** *See* Brodley, Potential Competition Mergers: A Structural Synthesis, 87 Yale L.Rev. 1 (1977), for a fuller discussion of the development of this doctrine.

ments which it deemed essential to proof of the illegality of a merger under this theory:

1. the target market is substantially concentrated;

2. the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant; and

3. the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market.

*Id.* at 624–25, 94 S.Ct. at 2871. The Court concluded that in the case before it, plaintiff had failed to prove its case, finding that the state's restrictions on bank expansion eliminated the possibility that the acquiring company could enter the market independently and prevented it from being perceived as a market entrant.

The Court in its opinion went on to advise district courts of how the "perceived potential competition" theory would apply in the context of bank mergers generally.

In applying the doctrine of potential competition to commercial banking, courts must, as we have noted, take into account the extensive federal and state regulation of banks. Our affirmance of the District Court's judgment in this case rests primarily on state statutory barriers to *de novo* entry and to expansion following entry into a new geographic market. In States where such stringent barriers exist and in the absence of a likelihood of entrenchment, the potential-competition doctrine—grounded as it is on relative freedom of entry on the part of the acquiring firm—will seldom bar a geographic market extension merger by a commercial bank. In States that permit free branching or multibank holding companies, courts hearing cases involving such mergers should take into account all relevant factors, including the barriers to entry created by state and federal control over the issuance of new bank charters. Testimony by responsible regulatory officials that they will not grant new charters in the target market is entitled to

great weight, although it is not determinative. To avoid the danger of subjecting the enforcement of the antitrust laws to the policies of a particular bank regulatory official or agency, courts should look also to the size and growth prospects of the target market, the size and number of banking organizations participating in it, and past practices of regulatory agencies in granting charters. If regulatory restraints are not determinative, courts should consider the factors that are pertinent to any potential-competition case, including the economic feasibility and likelihood of *de novo* entry, the capabilities and expansion history of the acquiring firm, and the performance as well as the structural characteristics of the target market.

*Id.* at 641–42, 94 S.Ct. at 2879–80.

The *Marine Bancorporation* opinion also discussed briefly the concept of "actual potential competition" which focuses on the likelihood that long term deconcentration of an oligopolistic market will result if the acquiring firm is forbidden to enter the market by means of the merger and is required to enter through a *de novo* undertaking or through the acquisition of a smaller existing entrant. Stating that it had previously reserved the issue of whether this concept alone would provide a sufficient ground for rendering a merger unlawful, the Court once again declined to decide this question. *Id.* at 625, 639, 94 S.Ct. 2856. The issue has yet to be resolved by the Court.

The allegations in plaintiff's complaint regarding the elimination of potential competition between South and Bancorp in the assertedly concentrated Atlantic County and smaller banking markets can be used to support either branch of the potential competition theory. Plaintiff argues in its brief that the merger will eliminate the procompetitive influence exerted by Bancorp on other banks as a "perceived" source of additional competition and will eliminate "actual" increased competition which would occur if Bancorp were to expand its presence in those markets independently. Plaintiff

sets forth in detail in its memorandum of factual contentions its theory of the case and how it intends to prove the allegations in its complaint. It deals at length with each issue identified by the Supreme Court in the *Marine Bancorporation* case which must be considered in deciding whether a merger would eliminate potential competition. It further asserts its intention to show that the relevant market is an oligopoly, that, unlike the *Marine Bancorporation* case, regulatory and economic barriers to bank expansion in the markets are minimal, and that significant procompetitive effects of potential competition will be lost if the merger goes forward.

 Although the burden on plaintiff in proving its case under a potential competition theory is higher than under more traditional doctrines, the court cannot at this time say that plaintiff's complaint is frivolous. The mere fact that defendants and the intervenor doubt the government's ability to prevail on the merits in a case presenting novel and untried extensions of antitrust theory is an insufficient ground for concluding that the plaintiff's complaint is frivolous.[10] *U. S. v. United Banks of Colorado, Inc.*, [1971] Trade Reg.Rep. (CCH) ¶ 73,421 (D.Colo.1970).

 Finally, plaintiff's complaint alleges that the proposed merger will result in increased concentration in an already concentrated market. Neither the intervenor nor defendants in their briefs assert that this contention is frivolous, and the court is of the opinion that it is not. It is well established that an acquisition involving two dominant firms, the effect of which is likely to accelerate an existing trend toward oligopoly in the relevant market, will provide a basis for a finding of a violation of Section 7 of the Clayton Act. *See FTC v. Procter and Gamble Co.*, 386 U.S. 568, 87

S.Ct. 1224, 18 L.Ed.2d 303 (1967); *U. S. v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *Kennecott Copper Corp. v. FTC*, 467 F.2d 67 (10th Cir. 1972); *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *General Foods v. FTC*, 386 F.2d 936, 946 (3d Cir. 1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). Plaintiff's proofs in this regard must await a fuller hearing.

### 2. Unusual Circumstances

The court's attention has been directed to three cases decided after the Supreme Court's pronouncement of the "frivolity" standard in the *Houston* case which suggest that the presence of certain extraordinary facts might warrant the lifting of the statutory stay even when the government's complaint is not frivolous.

In *U. S. v. Michigan National Corp.*, [1974–2] Trade Reg.Rep. (CCH) ¶ 75,408 (E.D.Mich.1974)[11] and *First Midland Bank & Trust Co. v. Chemical Financial Corp.*, 441 F.Supp. 414 (W.D.Mich.1977), two district courts in Michigan were willing to lift the statutory stay in the face of a non-frivolous complaint because of the unusual circumstance that the acquiring company was a "phantom bank"—that is, a bank without assets or deposits, which had been created by a bank holding company for the sole purpose of acquiring an existing bank. Noting that the merger of an existing bank into a "phantom bank" would involve no commingling of assets, the court in *Michigan National Corp.* concluded that in such a circumstance the merger was no longer within the "normal procedure" of antitrust litigation contemplated by the *Houston* case and that the Supreme Court's "frivolity" standard was not controlling.

The *First Midland Bank* case also involved an acquisition by a "phantom bank."

---

**10.** Intervenor's suggestion that the potential competition doctrine is not a viable one is plainly untenable in light of the Supreme Court's discussion of the doctrine in the *Marine Bancorporation* case.

**11.** In this opinion, the district court lifted the stay with respect to two of the banks to be

acquired. In a later opinion in the same case, the court lifted the stay with respect to two more of the banks to be acquired on the same basis as in the earlier opinion. *U. S. v. Michigan National Corp.*, [1976–1] Trade Reg.Rep. (CCH) ¶ 60,860 (E.D.Mich.1975).

Relying heavily on the *Michigan National Corp.* decision, the court in *First Midland Bank* lifted the stay, noting that it did not read the *Houston* case as limiting the grounds for lifting the stay to frivolity of the complaint. The court held that another basis for lifting the stay would exist if the nature of the particular merger pending before the court rendered the problems of unscrambling virtually non-existent.[12]

Both courts, however, recognized that even a "phantom bank" merger would not obviate all of the problems associated with post-merger divestiture in the event the government ultimately prevailed on the merits. Each court therefore required that a detailed plan of divestiture be incorporated into the order lifting the stay. It is clear from a careful reading of the *First Midland Bank* opinion, however, that a plan of divestiture alone, no matter how detailed, would be insufficient to justify lifting the stay under the "no unscrambling problems" standard enunciated in that case. Agreeing with the opinions in *U. S. v. United Banks of Colorado, Inc.,* [1971] Trade Reg.Rep. ¶ 73,421 (D.Colo.1970) and *U. S. v. Citizens and Southern National Bank,* 339 F.Supp. 1143 (N.D.Ga.1972), the court stated that "maintenance of the banks as separate entities and agreeing to cooperate fully in the event divestiture is mandated will not warrant lifting the stay," 441 F.Supp. at 418. Only because in the case before it the acquiring bank was a "phantom bank" alleviating the bulk of the post merger difficulties of unscrambling, was the court in *First Midland Bank* willing to use a plan of divestiture to eliminate any remaining insignificant problems.

The only other post-*Houston* case cited by defendants in which the statutory stay was lifted is *U. S. v. United Virginia Bankshares, Inc.,* [1971] Trade Reg.Rep. (CCH) ¶ 73,466 (E.D.Va.1971).[13] There, a bank holding company proposed to acquire an existing bank. While there appears to be no published opinion setting forth the particular standard or facts which the court relied on to lift the stay, plaintiff in this case mentions the memorandum filed in that case by the Comptroller of the Currency in support of the motion to lift the stay which emphasized the weakness of the smaller rural bank to be acquired and the drastic deterioration that was likely to occur by the time the suit was decided.

Read together, these cases suggest that a court may, in its discretion, lift the statutory stay in the face of a non-frivolous complaint when it is satisfied that the facts before it are either of an emergent nature or sufficiently unusual to render insignificant the problems of post-merger divestiture which prompted Congress to enact the automatic stay provision. It should be noted that the former exception to the "frivolity" standard has not been spelled out in any opinion. In addition, it is not entirely clear to this court that the Michigan cases creating the latter exception reflect a correct statement of the law in light of the Supreme Court's decision in the *Houston* case.[14] However, the court finds it unnec-

---

12. It appears that the presence of unusual circumstances in the *First Midland Bank* case was not the basis on which the court ultimately lifted the stay. In a supplemental opinion, the court decided that the stay should be lifted because plaintiff, as a private litigant, had no standing to invoke the automatic stay provision and proceeded to deal with plaintiff's arguments as a request for a preliminary injunction. 441 F.Supp. at 420–26.

13. Defendants cite a case decided prior to the *Houston* opinion in which a district court lifted a stay in a bank merger case. *U. S. v. First National Bank of Hawaii,* 257 F.Supp. 591 (D.Haw.1966). However, as indicated in n. 6, *supra,* the court believes this case to be of limited precedential value because it was decided on the basis of standards applied in preliminary injunction cases without the benefit of the Supreme Court's decision in *Houston* which imposed a far more rigorous standard to bank merger stays.

14. As indicated previously, the court in *First Midland Bank* stated that it did not read the *Houston* opinion as limiting the grounds for a lifting of the stay solely to a frivolous complaint and that implicit in the Supreme Court's discussion of the problems of unscrambling was a recognition that the stay could be lifted if there were unusual facts eliminating the problems of unscrambling banks. 441 F.Supp. at 417.

essary to decide whether such exceptions exist. Even assuming their existence, the court is satisfied that defendants have failed to show any of the unusual circumstances which justify application of either exception in this case.

The transaction in this case does not involve a merger of an existing bank into a "phantom bank" with no assets or deposits. Instead, the proposed merger would bring the largest commercial banking organization in Atlantic County into the largest commercial banking organization in the State of New Jersey. Movants have not demonstrated that such a merger would raise none of the problems which prompted Congress to enact the statutory stay provision. Nor has this court been advised that any of the defendants is a failing or weak bank whose business is likely to deteriorate drastically if it is not acquired prior to the resolution of this case. On the contrary, it is undisputed that South is a profitable business which can be expected to continue to prosper even in the absence of a merger.

▇ Defendants seem to suggest that even in the absence of unusual circumstanc-

es, the stay should be lifted simply because they are prepared to cooperate fully in the event plaintiff ultimately prevails on the merits and to stipulate to a plan of divestiture in anticipation of such an eventuality. The court is not persuaded by defendants' contention. Such an argument was squarely rejected in *U. S. v. Citizens and Southern National Bank,* 339 F.Supp. 1143 (N.D.Ga. 1972).

Moreover, none of the cases cited by defendants to this court in which the stay was lifted has gone as far as defendants would have this court go. As discussed above, those cases confirm that a divestiture plan by itself is not sufficient to justify lifting the stay. *First Midland Bank & Trust Co. v. Chemical Financial Corp.,* 441 F.Supp. 414 (W.D.Mich.1977); *U. S. v. Michigan National Corp.,* [1974–2] Trade Reg.Rep. (CCH) ¶ 75,408 (E.D.Mich.1974); *U. S. v. United Virginia Bankshares, Inc.,* [1971] Trade Reg.Rep. (CCH) ¶ 73,466 (E.D.Va. 1971).[15]

▇ In essence, defendants' argument is that the stay should be lifted because old merger agreements grow stale if they are

---

This reasoning is troubling in two respects. First, such an interpretation of the *Houston* decision seems doubtful. Since, as the Supreme Court recognized, "a Federal court order cannot recreate the two banks that formerly existed," 386 U.S. at 370 n. 2, 87 S.Ct. at 1094 n. 2, quoting the Chairman of the Federal Reserve Board, the Court plainly held that the normal procedure should be to stay the merger pending the outcome of the litigation. If the *Houston* opinion can be read at all to allow for a lifting of the stay absent a frivolous complaint, it would seem to limit such exceptions to emergency situations of the type which the Bank Merger Act sets forth as grounds for expediting the administrative review procedure. 12 U.S.C. § 1828(c)(4), (6).

Second, the court is troubled by the implications of the standard of "unusual circumstances eliminating unscrambling problems" and questions whether it offers a workable exception to the "frivolity" rule. The creation of this standard can, in this court's view, only result in the reintroduction of the traditional preliminary injunction standard, since the exception invites inquiry into the likelihood of irreparable harm given the absence of unscrambling problems. Indeed, the court in the *First Midland Bank* case itself recognized that the arguments plaintiff was required to make in order to prevail on the issue of whether the existence of unusual

facts would in fact resolve all post-merger divestiture problems were ones which "relate more properly to the question of whether a preliminary injunction is appropriate," 441 F.Supp. at 420, and thus could not be considered in connection with the motion to lift the stay. The difficulty of evaluating a motion to lift a stay in the framework of traditional preliminary injunction standards, however, is that the court must do so in the absence of an adequate factual record.

15. Finally, this court notes that the effectiveness of defendants' proposed divestiture plan is vigorously contested by plaintiff in its brief. Defendants in their reply brief propose solutions to some of the remaining problems associated with post-merger divestiture. Leaving aside the fact that none of these proposals are anywhere set forth in any stipulation signed by the defendants and filed with this court, this continuing discussion merely underscores the difficulty in allowing a stay to be lifted simply on the basis of a divestiture plan. It forces a court to undertake at an early stage in the litigation and in the absence of a fully developed factual record a review of all the concerns which led to the enactment of the Bank Merger Act.

not quickly consummated. Mere staleness, as the Supreme Court's *Houston* opinion and subsequent case law makes clear, is not a sufficient ground for lifting the stay. Moreover, this argument was explicitly rejected in *U. S. v. United Banks of Colorado, Inc.*, [1970] Trade Reg.Rep. (CCH) ¶ 73,421 (D.Colo.1970). The risk of delays engendered by the dictates of the Bank Merger Act is one the banks must have been well aware of from the inception of this merger agreement.

The motions by defendants and the intervenor to lift the statutory stay are denied.